1

2                IN THE UNITED STATES DISTRICT COURT FOR THE
                     WESTERN DISTRICT OF MISSOURI
3                          WESTERN DIVISION

4
UNITED STATES OF AMERICA,      ) Case No. 19-00006-01-CR-W-HFS
5                              )
           Plaintiff,          ) Kansas City, Missouri
6                              ) January 3, 2019
v.                             )
7                              )
CHRISTOPHER C. KELLEY,         )
8                              )
           Defendant.          )
9  _____)

10
           TRANSCRIPT OF PRELIMINARY AND DETENTION HEARING
11            BEFORE THE HONORABLE JOHN T. MAUGHMER
                 UNITED STATES MAGISTRATE JUDGE
12

13  APPEARANCES:

14  For the Plaintiff:          Ms. Alison D. Dunning
                                Assistant United States Attorney
15                              400 E. Ninth St., Ste. 5510
                                Kansas City, MO  64106
16                              (816) 426-3122

17  For the Defendant:          Mr. Travis Poindexter
                                Federal Public Defender's Off.
18                              818 Grand Blvd., Ste. 300
                                Kansas City, MO  64106
19                              (816) 471-8282

20  Court Audio Operator:       Ms. Kerry Martinez

21  Transcribed by:             Rapid Transcript
                                Lissa C. Whittaker
22                              1001 West 65th Street
                                Kansas City, MO  64113
23                              (816) 914-3613

24

25  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.

(Court in Session at 1:33 p.m.)

1

2      THE COURT:  Calling this afternoon Criminal Action No.

3  18-00189-JTM, *United States of America vs. Christopher C. Kelley*.

4  May I first please have the entry of appearance of counsel for

5  the United States?

6      MS. DUNNING:  Alison Dunning on behalf of the

7  Government, Your Honor.

8      THE COURT:  Thank you, Mr. Dunning.  And for Mr. Kelley?

9      MR. POINDEXTER:  Good afternoon, Judge.  Travis

10  Poindexter for Mr. Kelley who is present today.

11      THE COURT:  Thank you, Mr. Poindexter.  Calling this

12  matter today, Mr. Kelley, for the purpose of a preliminary

13  hearing with respect to charges that you face in a Complaint

14  filed by the United States on December 19, as well as for a

15  hearing with respect to the Government's Motion for Pretrial

16  Detention.  Ms. Dunning, are you ready to proceed for the United

17  States with both the preliminary hearing and the Government's

18  motion?

19      MS. DUNNING:  Yes, Your Honor.

20      THE COURT:  Mr. Poindexter, are you ready to proceed?

21      MR. POINDEXTER:  We are, Judge.

22      THE COURT:  Very well.  Ms. Dunning.

23      MS. DUNNING:  Your Honor, first, with regard to both

24  motions, I would like to offer a stipulation to the Pretrial

25  Report prepared in this case, and if called to testify, the

1   probation officer would testify consistently on direct exam with

2   the information in the report.  But I also do have a proffered

3   addition to the report.

4        THE COURT:  Mr. Poindexter, do you wish to join that

5   stipulation?

6        MR. POINDEXTER:  Yes, Your Honor.  I reviewed that

7   report with Mr. Kelley and it seems to be factually accurate.

8        THE COURT:  Very well.  Ms. Dunning.

9        MS. DUNNING:  Your Honor, I had made Mr. Poindexter and

10  Mr. Hair aware of an entry in Missouri Case.net for Case No.

11  18DK-CR00416, which is a case pending against, Mr. Kelley in

12  DeKalb County filed with an Information on December 19th, 2018.

13  And that information, it's a Misdemeanor Information.  It alleges

14  two counts of trespass in the first degree which is a State of

15  Missouri Class B misdemeanor, as well as a third count of Class C

16  misdemeanor of littering.  Those charges with regard to the

17  trespass do name two victims.  The first is Mark Wilhoit who

18  lives at 3188 Southeast Wamsley Road in Cameron.  And a second

19  victim is listed as Nicolette, but I think it might be Nicholas

20  Regan who lives at 6051 Southeast South Route C in Cameron.  And

21  I would just make the Court aware that those are both addresses

22  that are very close to the defendant's address in Cameron,

23  Missouri.

24        THE COURT:  Mr. Poindexter, any objection to the

25  proffered testimony?

1     MR. POINDEXTER:  Judge, no objection to the fact that

2  the Information exists.  We do not stipulate or agree that

3  anything supporting those facts would support those charges.

4     THE COURT:  Very well.  And, Mr. Kelley, just so you're

5  clear, what I've asked Mr. Poindexter is whether he would agree

6  that Ms. Dunning could provide testimony consistent with what she

7  said.  That doesn't mean that it's true or not true, just that

8  that is the testimony that would be provided.  Ms. Dunning.

9     MS. DUNNING:  Your Honor, the Government does wish to

10 call Special Agent Wray.  But I will just for purposes, we don't

11 necessarily go through everything in the Complaint Affidavit, so

12 I will offer a stipulation to the Affidavit itself, but I do

13 intend to call her, so I can cover that with her directly.

14    THE COURT:  And, Mr. Poindexter, do you wish to

15 stipulate that, if Ms. Wray were called to testify, she would

16 testify consistently with the information in her report?

17    MR. POINDEXTER:  Yes, Your Honor.

18    THE COURT:  Ms. Dunning.

19    MS. DUNNING:  Your Honor, the Government calls Special

20 Agent Kathryn Wray.

21    THE COURT:  Ms. Wray, would you please step forward to

22 be sworn?

23      KATHRYN E. WRAY, GOVERNMENT'S WITNESS, SWORN

24    THE COURT:  Ma'am, if you'd please have a seat.  And if

25 you would, please state your name and spell your name for the

1  record.

2          MS. WRAY:  My name is Kathryn Wray, K-A-T-H-R-Y-N.  My

3  last name is W-R-A-Y.

4          THE COURT:  Thank you, ma'am.  Ms. Dunning.

5          MS. DUNNING:  Thank you.

6                      DIRECT EXAMINATION

7  BY MS. DUNNING:

8  Q.  Ma'am, where are you employed?

9  A.  I'm a Special Agent with the Bureau of Alcohol, Tobacco,

10 Firearms and Explosives.

11 Q.  And is that commonly referred to as the ATF?

12 A.  It is.

13 Q.  How long have you been employed by the ATF?

14 A.  Thirteen years and eleven months.

15 Q.  What is your position there?

16 A.  I'm a Special Agent.

17 Q.  And can you just briefly describe for us what is it that you

18 do as a Special Agent?  What are your general duties?

19 A.  I just investigate federal firearms violations.

20 Q.  And in this particular case involving the defendant,

21 Christopher C. Kelley, were you investigating the potential of

22 federal firearms violations with regard to Mr. Kelley?

23 A.  Yes.

24 Q.  And did that investigation begin in October of 2018?

25 A.  Yes.

1  Q.  And that investigation began with other officers, correct?

2  A.  It did.

3  Q.  Or other agencies.  And you became aware of it in

4  approximately November 2018?

5  A.  Yes.

6  Q.  So, I want to talk to you a little bit about that.  Your

7  Affidavit that you prepared for the Complaint, do you have a copy

8  of that in front of you?

9  A.  Yes.

10 Q.  All right.  And so, should either of the parties want to

11 direct you to a particular section, you do have all six pages?

12 A.  Yes.

13 Q.  Okay.  All right.  So, in October of 2018, did law

14 enforcement in Clinton County, Missouri, become aware of Mr.

15 Kelley?

16 A.  Yes.

17 Q.  And was that based on something that he had done publicly at

18 the Clinton County Courthouse?

19 A.  Yes.

20 Q.  Did he make threats to any person or persons at that time

21 that you became aware of?

22 A.  Yes.

23 Q.  And who did he threaten at that time?

24 A.  He threatened to kill the President of the United States and

25 the Clinton County Sheriff Larry Fish.

1  Q.  Do you know if he did that in person to the sheriff?

2  A.  I do not.

3  Q.  Okay.  And as a result of that, did the Clinton County

4  Sheriff's Office refer that over to DeKalb County Sheriff's

5  Office and ask them to follow up on it?

6  A.  Yes.

7  Q.  Is Mr. Kelley's residence in DeKalb County?

8  A.  Yes.

9  Q.  And to your knowledge did DeKalb County then follow up on

10 that?

11 A.  Yes.

12 Q.  So, I want to talk to you about some various events that

13 occurred the following day on October 11th of 2018.  The DeKalb

14 County Sheriff, it looks like his name is Andy Clark, is that

15 correct?

16 A.  Yes.

17 Q.  Did he receive information from a witness regarding some

18 specifics of things that were going on with Mr. Kelley?

19 A.  Yes.

20 Q.  All right.  And was he made aware that Mr. Kelley is a

21 veteran of the military?

22 A.  Yes.

23 Q.  Who was on medication and suffers from PTSD?

24 A.  Yes.

25 Q.  Did he receive information from that witness about whether or

1  not Mr. Kelley had firearms or a firearm or firearms available to

2  him?

3  A.  Yes.

4  Q.  What did he -- what was he made aware of?

5  A.  He was made aware that Kelley is routinely armed with a

6  handgun and has multiple firearms and ammunition in his

7  residence.

8  Q.  All right.  And you did later serve a search warrant at Mr.

9  Kelley's residence, correct?

10  A.  Yes.

11  Q.  Fair to say there's a residence, there's a cellar, and then

12  there's a barn at the residence?

13  A.  Yes.

14  Q.  When you all searched each of those locations, did you find

15  firearms?

16  A.  Firearms were located in the residence and the detached barn.

17  Q.  Okay.  Do you remember approximately how many?

18  A.  Fifteen.

19  Q.  Was there also ammunition in --

20  A.  Yes.

21  Q.  And was that in the same two locations?

22  A.  There was ammunition all over the property.

23  Q.  Now, on October 11th of 2018, the person that contacted

24  Sheriff Clark, did they indicate -- did they express any concern

25  for safety of police officers?

A.  Yes.

Q.  And why?

A.  They stated that he disliked police officers.  He was infatuated with police shootings and had made statements that he would kill police officers and barricade himself in his house.

Q.  Okay.  And how about at that time did Mr. Kelley have -- does he have minor children?

A.  He does.

Q.  And was there some statement that was made about concerns for -- that the children had expressed some worries or concerns?

A.  Yes.

Q.  And can you tell us about that?

A.  The children texted their mother that morning and they were scared of their father's behavior and they were hiding underneath the beds.  And she made the decision to send her parents to the house to get them.

Q.  Okay.  And did that, in fact, happen to your knowledge?

A.  It did.

Q.  All right.  And so the children's grandparents came and got them on October 11, 2018, sometime presumably in the morning?

A.  Yes.

Q.  Later that day did Sheriff Clark have actual contact with Mr. Kelley, the defendant?

A.  Yes.

Q.  Regarding that last thing that we talked about with the

1  children and the grandparents picking them up, was there a

2  comment that was reported by Sheriff Clark that seemed connected

3  to that?

4  A.  Yes.

5  Q.  Can you describe that for the Court?

6  A.  Yes.

7  Q.  During the transport Kelley told Sheriff Clark that he was

8  supposed to have a walk with his father.  And he later stated,

9  quote, "We were going to be with Jesus together.  I was going to

10 take my son on that walk this morning, but his grandparents came

11 and got him."

12 Q.  Did he also make statements regarding his uncle?

13 A.  Yes.

14 Q.  Did you learn in the course of your investigation there was

15 some sort of maybe family difference or dispute about some

16 property?

17 A.  Yes.

18 Q.  Did a witness advise you that the defendant was upset about

19 how that had gone, how that had turned out?

20 A.  Yes.

21 Q.  Was he upset with his uncle?

22 A.  Yes.

23 Q.  In the presence of Sheriff Clark, did the sheriff report that

24 he made some statement about his uncle?

25 A.  Yes.

1  Q.  What did he say?

2  A.  Kelley stated, quote, "I should have killed my uncle."  End

3  quote.

4  Q.  Did Mr. Kelley during that same contact with the sheriff make

5  comments about President Trump?

6  A.  Yes.

7  Q.  And what did he say?

8  A.  Let's see.  He said something to the effect that -- oh, I'm

9  sorry.  He told Sheriff Clark that his father was the President

10 of the United States and the Bible told him that Trump should not

11 be president.  And maybe it was trying to tell him that he needed

12 to be president.

13 Q.  Okay.  And was that -- I guess the president had come up the

14 day before at the Clinton County Courthouse as well, is that

15 correct?

16 A.  The President of the United States?

17 Q.  Yes.

18 A.  I --

19 Q.  Did Mr. Kelley make threats towards the president the day

20 before?

21 A.  Oh, yes.

22 Q.  Okay.

23 A.  Yes.

24 Q.  Now, Sheriff Clark, where did he drop Mr. Kelley off that

25 day?

1  A.  He was taken to Mosaic in St. Joseph for a 96-hour hold.

2  Q.  And was that for a mental health-type evaluation?

3  A.  It was.

4  Q.  Do you know if he stayed the entire time?

5  A.  I do not.

6  Q.  Okay.  Did the sheriff receive information from some

7  personnel that there had been drug testing on the defendant

8  during his stay there?

9  A.  Yes.

10  Q.  And what was the result of that?

11  A.  It indicated there was the presence of methamphetamine in his

12  system.

13  Q.  Now, also on October 11th of 2018, was there a mental health

14  professional that reached out to the Sheriff's Office regarding

15  Mr. Kelley and his status?

16  A.  Yes.

17  Q.  What did the Sheriff's Office -- what information did they

18  receive at that time?

19  A.  The psychiatrist reached out to the sheriff and expressed

20  concern that Kelley was a danger to himself and other law

21  enforcement.  And due to his current condition, they were to use

22  extreme caution -- his current condition and his training, to use

23  extreme caution and that specifically Kelley fantasizes about

24  killing cops.

25  Q.  Was there other information that was received during the

1  investigation that Mr. Kelley, the defendant, has some prior

2  training through his military experience with regard to, I guess,

3  various aspects of military training?

4  A.  Yes.

5  Q.  Okay.  Weaponry and also some psychological type things for

6  lack of a better word.  Is that fair to say?

7  A.  Yes.

8  Q.  All right.  And there was -- I'm just going to kind of walk

9  through these.  You tell me if I'm getting these wrong just for

10 the sake of getting through these.  But there was an Order of

11 Protection *Ex parte* -- or a Temporary Order of Protection that

12 was issued on October 15th of 2018, and then served the following

13 day on the defendant, correct?

14 A.  Yes.

15 Q.  There was a hearing that was held and ultimately a Full Order

16 of Protection was issued on October 24th of 2018?

17 A.  Yes.

18 Q.  All right.  And that -- was that Order of Protection served

19 on the defendant at a later time?

20 A.  It was.

21 Q.  And was it an order modifying that entered and then also

22 served on the defendant at a later time?

23 A.  Yes.

24 Q.  And the information in Paragraph 3 talking about what the

25 order prohibits, is that information correct?

A.  Yes.

Q.  Okay.  And I want to talk to you about contact that a Highway Patrol trooper had with the defendant on November 14th of 2008, in St. Joe.  Do you recall that incident?

A.  I do.

Q.  All right.  And you have summarized that in your report whereas you've written does the trooper kind of have an impromptu conversation with the defendant about running a stop sign, it sounds like in or around a shopping center?

A.  Yes.

Q.  Okay.  At that time did he see any weapons in the defendant's vehicle?

A.  Yes.  He saw a holstered Glock pistol in the front seat.

Q.  Okay.  Did he also see a knife?

A.  Yes.

Q.  Later during the search warrant of the defendant's house in December, was a Glock recovered?

A.  Yes.

Q.  What happened after the trooper had this interaction with the defendant in the parking lot?

A.  He just made contact with him because he had run through a stop sign.  And my understanding is that he approached the passenger's side window and just said, hey, slow down.  You know, you ran a stop sign in a shopping center.  And he and some other troopers then went into Chipotle Mexican Restaurant and sat down

1  and ate lunch, at which time Mr. Kelley parked the car, came into

2  the restaurant and became -- and confronted them about the

3  situation and which they diffused, and then later identified who

4  he was.

5  Q.  Okay.  That same day was there an advisory that was issued

6  with regard to Mr. Kelley?

7  A.  Yes.

8  Q.  And what kind of advisory is that and what is its purpose?

9  A.  It's a MIAC alert.  And it's to alert other officers that --

10  to use extreme caution when dealing with Mr. Kelley, and it just

11  explained briefly a little bit about his military background and

12  that he was known to have weapons.

13  Q.  Okay.  Now, November 21st of 2018, did you interview a

14  witness that had previously spoken to Sheriff Clark about the

15  defendant?

16  A.  Which date?

17  Q.  On November 21 of 2018.

18  A.  Yes.

19  Q.  And the person that you spoke to is a relative of the

20  defendant, correct?

21  A.  Yes.

22  Q.  And also the petitioner in the Order of Protection that's the

23  basis for this charge, correct?

24  A.  Yes.

25  Q.  Did you learn from that witness -- did they describe for you

1   sort of a motto or a statement that the defendant had made about

2   his prior work while in the military?

3   A.   Yes.

4   Q.   And what was what?

5   A.   "Win the hearts and minds or shoot them in the face."

6   Q.   Did you later receive information from that same witness that

7   the defendant had made a Facebook post that concerned you in

8   light of what you've just described?

9   A.   Yes.

10  Q.   Can you describe that for the Court?

11  A.   On December 18, 2018, I received a report that Kelley had

12  posted a message on his Facebook that stated, quote, "Hearts and

13  minds means two the chest and one the head."

14  Q.   And what did you take that to mean?

15  A.   It was a reference to the psychological operations motto of

16  "Win the hearts and minds or shoot them in the face."

17  Q.   And the statement of the two in the chest and one in the head

18  or two the chest, one the head that you said, what did you think

19  that that meant?

20  A.   To shoot a person twice in the chest and once in the head.

21  Q.   All right.  So, kind of going forward to December 17th, '18,

22  did Sheriff Clark go to the defendant's home in Cameron,

23  Missouri, and talk to him about whether or not he had any

24  firearms?

25  A.   Yes.

1  Q.  And after that Order of Protection was entered, at that point

2  was the defendant not allowed to have those firearms or to have

3  firearms?

4  A.  He was not allowed to have firearms.

5  Q.  Did the defendant admit to having any firearms at that time

6  on December 17th of 2018?

7  A.  He told Sheriff Clark he did not have any firearms.

8  Q.  Did Sheriff Clark get any information after that about that

9  conversation he had with the defendant?

10  A.  Yes.

11  Q.  Was that from a friend of the defendant's?

12  A.  Yes.

13  Q.  What did that person relay to Sheriff Clark?

14  A.  He telephoned Sheriff Clark and he said that he had just

15  spoken with Kelley and Kelley admitted that he did, in fact, have

16  guns but that he was not going to tell Sheriff Clark that, so he

17  lied to him.

18  Q.  And did he deny that he would hurt himself?  Did the

19  defendant say I'm not going to hurt myself, but I may hurt other

20  people?

21  A.  He did.  He went on to say I'm not hurting myself, I might

22  hurt somebody else, some other people.

23  Q.  And just to be clear, we've described this person as a friend

24  that made this information.  That's different from the first

25  witness that's involved with the Order of Protection, correct?

A.  Yes.

Q.  And both of those people are different from the mental health professional that also reached out to the Sheriff's Office, correct?

A.  Yes.

Q.  Did the friend that described the conversation he had with the defendant after Sheriff Clark was there, did he also alert the sheriff to a third person who had information about the defendant having guns at his home?

A.  Yes.

Q.  And what was the gist of that?

A.  He told Sheriff Clark that another witness had been at Kelley's house approximately one week ago and had observed a gun -- had observed, quote, "guns laying all over the yard and leaned up against the building."  End quote.

Q.  And did that person provide a photograph?

A.  Yes.

Q.  Now, finally, did the witness, the friend that spoke to the defendant after Sheriff Clark had been out there, did he also indicate that the defendant's dad had at one point removed guns from Mr. Kelley but had since returned them?

A.  Yes.

Q.  You've already testified that during the search warrant you recovered, I think you said approximately 15 or exactly 15 firearms and multiple rounds of ammunition from the defendant's

1  residence?

2  A.  Approximately 20,000 rounds of ammunition.

3  Q.  Okay.  The pending charges that we discussed at the outset of

4  the hearing regarding the two trespassing charges and the

5  littering charge, I read into the record the names of the victims

6  that are alleged in those charges, a Mr. Wilhoit and a Mr. Regan.

7  Are those neighbors of the defendant's?

8  A.  They are.

9  Q.  And are they both law enforcement officers by chance?

10 A.  They are.

11 Q.  Okay.  The Pretrial Report indicates that there is another

12 Order of Protection, an *ex parte* or Temporary Order of Protection

13 that has been filed by another person who is named in the report.

14 And her initials are C.H.  Is that also a neighbor of the

15 defendant's?

16 A.  Yes.

17 Q.  Is C.H. -- the Pretrial Report indicates that that is due to

18 multiple threats.

19 A.  Yes.

20 Q.  Are you aware of the nature of those?

21 A.  I am.

22 Q.  Can you describe those for us?

23 A.  That individually apparently owes Mr. Kelley $40.  And on

24 more than one occasion he has indicated that he plans to slit her

25 throat.

1    MS. DUNNING:  Your Honor, I have nothing further.

2    THE COURT:  Mr. Poindexter, cross-examination, sir?

3    MR. POINDEXTER:  Yes, Your Honor.  Just a second here.

4                     CROSS-EXAMINATION

5  BY MR. POINDEXTER:

6  Q.  Good afternoon, Agent -- Special Agent.  How you doing?

7  A.  Hi.

8  Q.  All right.  Just to clarify the timeline here, you testified

9  on direct that the investigation by other law enforcement

10 agencies began in approximately October of last year, 2018, is

11 that correct?

12 A.  Yes.

13 Q.  And was that agency or agencies, would those include the

14 Clinton County and DeKalb County Sheriff's Office?

15 A.  Yes.

16 Q.  And other law enforcement agencies?

17 A.  Not at that time.  At some point the Secret Service became

18 involved, but I don't know anything about that.

19 Q.  Okay.  But initially it was just based upon the Clinton

20 County and DeKalb County allegations, is that right?

21 A.  Yes.

22 Q.  And, you also referenced in terms of these orders of

23 protection that formed the foundation for the alleged charge

24 here, started with an *ex parte* that was issued in October, I

25 think October 15th of 2018, is that right?

1  A.  Yes.

2  Q.  Okay.  Subsequent to that, there was a Full Order of

3  Protection issued October 24th.

4  A.  Yes.

5  Q.  But that was not served on Mr. Kelley until November 15th, is

6  that correct?

7  A.  Correct.

8  Q.  Do you know who served that order?

9  A.  Sheriff Andy Clark.

10  Q.  Excuse me, Sheriff who?

11  A.  Andy Clark.

12  Q.  Okay.  And do you know where that was served at?

13  A.  I do not.

14  Q.  Do you know whether or not Sheriff Clark described what was

15  contained in the full order or whether it was just handed to him?

16  A.  I do not.

17  Q.  Okay.  So, you don't know if anyone specifically advised him

18  of what conditions were set out in the order?

19  A.  No.

20  Q.  You then referenced that there was a modification done

21  November 29th of 2018, is that correct?

22  A.  Yes.

23  Q.  Within that modification contained a condition that

24  specifically said that Mr. Kelley could not possess firearms, is

25  that right?

1  A.  Yes.

2  Q.  And that order was served on Mr. Kelley November 30th?

3  A.  Yes.

4  Q.  And that was done by him actually being at the Sheriff's

5  Office and them giving it to him?

6  A.  He went to the Clinton Sheriff's Office.

7  Q.  Voluntarily?

8  A.  Yes.

9  Q.  Okay.  And do you know at that time on November 30th whether

10 anyone sat down and reviewed with him what conditions were

11 contained in that violation order?

12 A.  I don't know.

13 Q.  Or the *ex parte* order, I should say.

14 A.  I don't know.

15 Q.  All right.  Now, the modification you specifically note has

16 this additional condition of no firearms, that's correct?

17 A.  Yes.

18 Q.  So, is it fair to say that the other orders that were issued

19 did not contain that condition?

20 A.  Yes.

21 Q.  Yes, that it did not contain the condition?

22 A.  Yes.  It did not contain the condition.

23 Q.  Okay.  And other than the *Ex parte* and Full Orders of

24 Protection, apart from that, at least federally, are you aware of

25 any other prohibition that would have prevented Mr. Kelley from

1  lawfully possessing guns?

2  A.  No.

3  Q.  Okay.  And also again to clarify, although the initial full

4  order was issued October 24th, he didn't get it till November

5  25th.  Or I'm sorry, November 15th.

6  A.  Yes.

7  Q.  And then the prohibition for the guns isn't for another half

8  a month later on November 30th when he actually gets that?

9  A.  No.  Despite the box not being checked, he's still federally

10 prohibited from possessing firearms.

11 Q.  In terms of an order telling him that he cannot possess

12 guns, --

13 A.  Uh-huh.

14 Q.  -- that was not provided to him until November 30th of 2018?

15 A.  Correct.

16 Q.  Okay.  Now, when you became involved in the investigation,

17 did you do your own criminal history check on Mr. Kelley?

18 A.  Yes.

19 Q.  And are you aware of him having any prior convictions that

20 involve assaultive combat?

21 A.  No.

22 Q.  Are you aware of any prior convictions that involve him

23 displaying weapons in a dangerous manner?

24 A.  No.

25 Q.  Are you aware of any prior convictions for him threatening an

1  individual with a gun or any other type of weapon?

2  A.  No.

3  Q.  Now, you listed a number of contacts that law enforcement had

4  with Mr. Kelley during the course leading up to his ultimate

5  arrest.  Let's start with the October 10th well check that was

6  done by, I believe, Clinton County, is that correct?

7  A.  Clinton County requested DeKalb do the well check.

8  Q.  Okay.  And that is because, prior to that, Mr. Kelley had

9  went to the Clinton County Courthouse?

10 A.  Yes.

11 Q.  Okay.  Are you aware of when he was at the courthouse whether

12 or not anyone saw him with a dangerous weapon or a firearm?

13 A.  No.

14 Q.  Okay.  They were just concerned about some comments that he

15 made?

16 A.  Yes.

17 Q.  At that time they didn't relate that he actually assaulted

18 anyone?

19 A.  No.

20 Q.  Okay.  So, then the well-being check is done by DeKalb County

21 on behalf of Clinton County, is that right?

22 A.  Yes.

23 Q.  All right.  And at that time Mr. Kelley was contacted

24 directly by the sheriff, is that right?

25 A.  Yes.

Q.   And Mr. Kelley agreed to speak with the sheriff?

A.   Yes.

Q.   Okay.  And during the conversations that he had with the sheriff at that time, is there an indication that he was armed with a firearm?

A.   No.

Q.   Any indication he was armed with any dangerous weapon?

A.   No.

Q.   You also referenced that there was a contact on October 11th, is that correct?

A.   Yes.

Q.   And that's where Sheriff Clark goes out, and it's actually Mr. Kelley that approaches the sheriff and asks for help, is that right?

A.   Yes.

Q.   Any indication that at the time Mr. Kelley approached the sheriff that he was armed with any dangerous firearm or weapon?

A.   No.

Q.   And did Sheriff Kelley [sic] ever indicate that he observed any firearm or weapon?

A.   Sheriff Clark?

Q.   Sheriff Clark.  I'm sorry.

A.   He did not indicate that.

Q.   All right.  And then you referenced an incident that occurred on November 14th with the Missouri Highway Patrol, is that right?

1  A.  Yes.

2  Q.  All right.  And so to put into context in the chronology of

3  this, Mr. Kelley had not yet been served with any prohibition on

4  firearms on November 14th, is that correct?

5  A.  Correct.

6  Q.  That didn't happen until the next day.

7  A.  Correct.

8  Q.  Or at least when the modification was made, is that right?

9  He wasn't served with the notice of not having firearms until

10  November 30th?

11  A.  Correct.

12  Q.  All right.  All right.  So, this incident with the Highway

13  Patrol, that was in St. Joseph?

14  A.  Yes.

15  Q.  And it was in a parking lot of like a shopping mall?

16  A.  It initially started in the parking lot and then it was

17  inside the Chipotle restaurant.

18  Q.  Okay.  So, it wasn't the result of like some type of traffic

19  stop or them pulling him over for something?

20  A.  No.

21  Q.  All right.  Did you talk to the Highway Patrolman directly

22  about what happened?

23  A.  I did.

24  Q.  Okay.  And so would it be fair to say that him and some other

25  officers or patrolmen were going to lunch and walking through the

1  parking lot?

2  A.  Yes.

3  Q.  And they're saying that maybe he ran a stop sign that's

4  within the parking lot?

5  A.  Yes.

6  Q.  Okay.  So, not like he was on the road anywhere violating a

7  traffic ordinance.  He's like in the parking lot and just went

8  through a stop sign there inside the parking lot?

9  A.  Yes.

10 Q.  All right.  And as a result, they approached him and said,

11 hey, be careful with what you're doing.  Is that about the gist

12 of it?

13 A.  Yes.

14 Q.  When they're looking in the car they see a gun that's

15 holstered?

16 A.  Yes.

17 Q.  They see a knife that's there?

18 A.  Yes.

19 Q.  All right.  They don't ask anything about it, right?

20 A.  They don't know who he is.

21 Q.  They don't ask anything about those items, do they?

22 A.  No.

23 Q.  All right.  And they let him go?

24 A.  Yes.

25 Q.  All right.  At any point did they say when they confronted

1  him that he made any threats to them at that point?

2  A.  They just said he became agitated but no threats.

3  Q.  Okay.  Now, subsequent to that, those Highway Patrolmen

4  apparently went in to have lunch, is that right?

5  A.  Yes.

6  Q.  And at some point Mr. Kelley comes into the restaurant?

7  A.  Yes.

8  Q.  When he comes into the restaurant, are you aware of whether

9  anyone says he has a gun?

10 A.  No.

11 Q.  Anyone say he has a dangerous weapon?

12 A.  No.

13 Q.  Okay.  And he then approaches the Highway Patrolmen, is that

14 right?

15 A.  Yes.

16 Q.  And did the Highway Patrolmen indicate what he said?

17 A.  No.

18 Q.  Do you know if he simply asked for his badge number?

19 A.  He was described as being volatile.  I don't know if he asked

20 for his badge number.

21 Q.  Okay.  Described his being volatile.  Anything that supports

22 the volatility?

23 A.  No.

24 Q.  Okay.  And then apparently on December 17th there was contact

25 with the sheriff also, is that right?

1   A.  You said December?

2   Q.  Correct.

3   A.  Yes.

4   Q.  And that's also by the DeKalb County Sheriff Clark?

5   A.  Yes.

6   Q.  And on that occasion Mr. Clark actually approached Mr.

7   Kelley, is that right?

8   A.  Yes.

9   Q.  Did Sheriff Clark ever indicate at that point that he

10  observed Mr. Kelley in possession of any firearms?

11  A.  No.

12  Q.  Did he observe him in possession of any dangerous weapons?

13  A.  I don't know.

14  Q.  Okay.  He didn't indicate that he did?

15  A.  No.

16  Q.  So, on all of these occasions where Mr. Kelley is referenced

17  in your Affidavit, it involves him saying things, is that right?

18  A.  Yes.

19  Q.  There's no indication that he ever at any point had a

20  dangerous weapon with him, correct?

21  A.  He did in his vehicle.

22  Q.  Correct.  But in that occasion he was approached by the

23  police.  He didn't approach anyone with a dangerous weapon?

24  A.  Correct.

25  Q.  At no point did he approach anyone with a firearm?

1  A.  Not that I'm aware of.

2  Q.  Okay.  And then in all the locations where these contacts

3  occurred, including courthouse, personal contacts by the sheriff,

4  any indication that Mr. Kelley ever took a gun to a location

5  where it was prohibited?

6  A.  No.

7  Q.  So, like he didn't walk into the courthouse with a gun or

8  anything like that?

9  A.  No.

10  Q.  All right.  He didn't walk into the restaurant with a gun?

11  A.  I don't know.

12  Q.  Okay.  No one reported that he did.

13  A.  No one reported that.

14  Q.  And even after the deal with the Highway Patrolmen, I mean

15  they didn't like arrest him anything.  They let him go.

16  A.  Yes.

17  Q.  All right.  Now, you referenced -- or your Affidavit

18  references the search warrants that were executed at Mr. Kelley's

19  property.  And I believe you had three separate search warrants,

20  is that correct?

21  A.  There were six total.

22  Q.  Six total.  All right.  I'm aware of one for his residence.

23  A.  Yes.

24  Q.  One for his barn.

25  A.  Yes.

1 Q.  One for his cellar.

2 A.  Yes.

3 Q.  Okay.  Okay.  The other ones would have been for his

4 vehicles, is that right?

5 A.  Yes.

6 Q.  Okay.  And in a synopsis, there was nothing found in any of

7 the vehicles that you searched?

8 A.  No.

9 Q.  Okay.  So, going to the house -- now, subsequent to doing the

10 search you actually provided a what's called a return of the

11 items that you recovered, is that right?

12 A.  I did.

13 Q.  All right.  And from the actual residence, meaning physically

14 inside the home, you basically got three guns, is that right?

15 A.  I would have to look at the sheet.

16 Q.  Would it refresh your recollection?

17 A.  It would.

18        MR. POINDEXTER:  Could I approach, Your Honor?

19        THE COURT:  You may.  You may.

20 BY MR. POINDEXTER:

21 Q.  Or do you have a copy of it?

22 A.  I don't have a copy.  Yes.  Three firearms.

23 Q.  Thank you.  One of them was a revolver, a .22-caliber

24 revolver, is that correct?

25 A.  If that's what's written on that sheet.

1  Q.  Did you find a .22-caliber revolver?

2  A.  Let's see.  Yes.

3  Q.  And that was in the bedroom?

4  A.  Yes.

5  Q.  One rifle?

6  A.  Yes.

7  Q.  Was that in a closet?

8  A.  Yes.

9  Q.  And one shotgun?

10 A.  Yes.

11 Q.  And where was that located?

12 A.  It says master bedroom.

13 Q.  You then, I guess just to get it out of the way, you did a

14 search at the cellar, but no firearms were located there, is that

15 correct?

16 A.  I'd need to review the property inventory sheet.

17 Q.  You testified on direct that you found firearms in the house

18 and the barn.  Here's the return for the cellar.

19 A.  Okay.  Yes.

20 Q.  No firearms in the cellar.

21 A.  No firearms in the cellar.

22 Q.  All right.  You then -- you also conducted a search of his

23 barn, is that right?

24 A.  Yes.

25 Q.  And from the return it indicates that each of the firearms

1  except one in the barn was in a safe, is that correct?

2  A.  Yes.

3  Q.  The only gun that was not in the safe was a shotgun, is that

4  right?

5  A.  In the barn?

6  Q.  Yes, in the barn.

7  A.  Yes.

8  Q.  And he had that on a rack?

9  A.  I don't know.  (Reviewing document).  Located on the east

10 wall.

11 Q.  On a rack in the barn.

12 A.  Okay.  Yes.

13 Q.  Is that correct?

14 A.  Yes.

15 Q.  But that was the only gun that was not in the safe in the

16 barn?

17 A.  In the barn.

18 Q.  Now, you also made reference in your direct testimony that

19 there were allocations -- allegations that Mr. Kelley made

20 comments about barricading himself in his house, is that right?

21 A.  Yes.

22 Q.  Anything that you observed from being inside that home that

23 showed some type of barricade being created?

24 A.  No.

25 Q.  Okay.  It was referenced in the Affidavit that one of the

1  sheriffs was provided information that Mr. Kelley, upon drug

2  testing, they found potentially some methamphetamine in his

3  system?

4  A.  Yes.

5  Q.  All right.  Have you seen those reports?

6  A.  No.

7  Q.  All right.  So, you're just getting this information from the

8  sheriff?

9  A.  Yes.

10  Q.  Do you know if the sheriff has seen those reports?

11  A.  I don't know.

12  Q.  Okay.  And do you know whether or not they cross-checked to

13  see whether or not his medications could indicate a positive for

14  some type of amphetamine in his system?

15  A.  I do not know.

16  Q.  Okay.  You didn't independently investigate that?

17  A.  I did not.

18  Q.  And are you aware of whether or not the sheriff investigated

19  that?

20  A.  I am not aware.

21          MR. POINDEXTER:  Okay.  Nothing further.  Thank you.

22          THE COURT:  Redirect examination, Ms. Dunning?

23          MS. DUNNING:  Yes, Your Honor.

24                      REDIRECT EXAMINATION

25  BY MS. DUNNING:

1  Q.  Special Agent Wray, was it concerning to you as law

2  enforcement officers based on what you knew that there were

3  firearms located in various locations of Mr. Kelley's property?

4  A.  Yes.

5  Q.  Even if they're in safe, do you believe that those pose a

6  danger?

7  A.  Yes.

8  Q.  Why is that?

9  A.  It's access.  It's access to 15 firearms and approximately

10  20,000 rounds of ammunition.

11  Q.  Was there information that Mr. Kelley wanders his property or

12  walks around his property?

13  A.  Yes.

14  Q.  In fact, on I think October 11th of 2018, did he actually

15  make contact with Sheriff Clark somewhere other than at his

16  house?  Did he drive up to him on an ATV or something of that

17  nature?

18  A.  He did.

19  Q.  Did the neighbors report that he walks around the property?

20  A.  Yes.

21  Q.  Did it appear to you all that he lives there alone?

22  A.  Yes.

23  Q.  When you say somebody is going to barricade themselves, can

24  that be done relatively quickly?  Does it have to be that you're

25  building a fort or a wall or anything?

1          MR. POINDEXTER:  Judge, that calls for speculation.

2          MS. DUNNING:  Well, I think asking for her meaning of

3    the term barricade.

4          THE COURT:  Sustained.

5    BY MS. DUNNING:

6    Q.  When you say no evidence of a barricade, in your experience

7    when you all say someone has barricaded themselves in a home,

8    what can that mean?

9    A.  It doesn't take any preparation at all.

10   Q.  Why do you say that?

11   A.  You can go inside and close the door and close curtains and

12   you're in there and anyone on the outside cannot see in.  You're

13   protected by the four walls of a house.

14   Q.  Was that a possibility for Mr. Kelley given the state of his

15   home as you all found it?

16   A.  Yes.

17   Q.  Did he have power to his home when you all served the search

18   warrant?

19   A.  He did because we had the power turned back on.

20   Q.  Okay.

21   A.  However, the power had been shut off the day before for non-

22   payment.

23   Q.  Did you all wait some period of time to serve the search

24   warrant based on the circumstances?

25   A.  We did.

1  Q.  Can you describe that?

2  A.  Mr. Kelley was arrested shortly after I left your chambers.

3  And it was about 4:30 in the afternoon and it was just continuing

4  to get darker.  And there was no power at the house at that time.

5  And so, we just felt like it was safer for everyone involved not

6  to go in until the following morning when we had daylight and

7  were able to have the power company turn the power back on.

8  Q.  And why was the reason for doing that?

9  A.  For officer safety.

10  Q.  And what would be the safety concern?

11  A.  There was some concern that the property could be booby-

12  trapped.  We had a certified explosives specialist with us and we

13  had a K-9 as well.

14  Q.  The photograph that you testified to that Mr. Kelley's second

15  friend had taken a photograph of a firearm there on the property,

16  where was that firearm apparently photographed?  Did it look like

17  it was in a building or outside?

18  A.  It was leaned up against a building.  I'm not sure if it was

19  the residence or the barn.

20  Q.  Did any of the firearms that you all recovered during the

21  search warrant, were they recovered in a location like that one

22  that was depicted in the photograph?

23  A.  Not leaned up against a building, but there was one outside.

24  Q.  Okay.  And where was it?

25  A.  It was on the Polaris ATV that he rides around in.

Q.  The cellar you had testified on cross-examination, you didn't

find any firearms or that you all didn't -- I know you didn't

necessarily search all these yourself, but that no firearms or

ammunition was found.  Was there any other item, illegal item

found in the defendant's cellar?

A.  Marijuana.

Q.  Was that leafy marijuana?

A.  It was a jar containing marijuana buds that field-tested

positive, along with gummies, THC gummies and also a container of

wax.

Q.  Do you field-test those things?

A.  I did.

Q.  Okay.  And when you say gummies, you mean edible marijuana

that looks like gummy --

A.  Yes.

Q.  -- candy?

A.  Yes.

        MS. DUNNING:  Okay.  I've nothing further, Your Honor.

        THE COURT:  Any recross examination, Mr. Poindexter?

        MR. POINDEXTER:  Briefly, Judge.

        THE COURT:  Yes, sir.

                    RECROSS EXAMINATION

BY MR. POINDEXTER:

Q.  Special Agent Wray, when Mr. Kelley was arrested were you

present?

1  A.  No.

2  Q.  You were not.  Where was he arrested at?

3  A.  My understanding he was arrested in a trooper's driveway, but

4  I was with the judge and I do not know the location of his

5  arrest.

6  Q.  Okay.  At the time of his arrest, are you aware of whether or

7  not he had a weapon?

8  A.  I don't believe he did.

9  Q.  At the time of his arrest, are you aware of whether or not he

10  had a firearm?

11  A.  I'm not aware.

12  Q.  And at any point are you aware of Mr. Kelley ever barricading

13  himself in from law enforcement?

14  A.  I am not aware.

15  Q.  You referenced you had concerns about booby-traps.  Did you

16  find any booby-traps?

17  A.  No.

18  Q.  And you also referenced that you had some K-9s present for

19  the property?

20  A.  We did.

21  Q.  Okay.  Did the K-9s discover anything unusual?

22  A.  No.

23        MR. POINDEXTER:  Nothing further.

24  EXAMINATION BY THE COURT:

25  Q.  Special Agent Wray, the Affidavit in support of your

1  Complaint, on pages -- at the bottom of pages 4 and 5 and 6

2  appears to list a large number of firearms recovered.  It appears

3  to me that there are some duplicative entries on those pages, is

4  that correct?

5  A.  Um --

6  Q.  For example, the Smith -- the very first one, the Smith &

7  Wesson CTG .22-caliber, Serial Number 50181 --

8  A.  Uh-huh.

9  Q.  -- is also listed at the -- that's at the bottom of page 4.

10 It's also listed at the top of page 5.

11 A.  The Smith & Wesson?  I don't see that.

12         MS. DUNNING:  I think it might be because it starts with

13 Glock, but it's kind of buried after Glock.  There does appear to

14 be some --

15         THE WITNESS:  Oh.  Okay.

16         THE COURT:  You're right.

17         THE WITNESS:  Yes.  That is.

18 BY THE COURT:

19 Q.  I guess what I'm asking is this appears to list a lot more

20 than 15 firearms.  And it appears to me it's because they're

21 duplicative entries.

22 A.  Okay.

23 Q.  And my question is, is there any particular reason that

24 they're duplicative?

25 A.  No.  No, not at all.  That's a mistake.

1  Q.  Fifteen was the number.

2  A.  Fifteen is the number.

3  Q.  Thank you, ma'am.  You may step down.

4        THE COURT:  Ms. Dunning, additional evidence, testimony

5  or proffers?

6        MS. DUNNING:  Only argument, Your Honor.

7        THE COURT:  Mr. Poindexter, evidence testimony or

8  proffers for Mr. Kelley?

9        MR. POINDEXTER:  Judge, I do have one witness and that's

10  going to be Mr. Kelley's father.

11        THE COURT:  Very well.  Sir, if you'd please step

12  forward and be sworn.  Please raise your right hand.

13    COL. STEVEN H. KELLEY, RET., DEFENDANT'S WITNESS, SWORN

14        THE COURT:  Sir, if you'd please have a seat.  And if

15  you'd please state your name for the record?

16        MR. KELLEY:  Steven H. Kelley.

17        THE COURT:  Thank you, sir.  Mr. Poindexter.

18        MR. POINDEXTER:  Thank you.

19                        DIRECT EXAMINATION

20  BY MR. POINDEXTER:

21  Q.  Mr. Kelley, are you acquainted with Christopher C. Kelley?

22  A.  I am, sir.

23  Q.  How do you know him?

24  A.  I am his father.

25  Q.  And, sir, do you have other children?

1   A.  I do.

2   Q.  And how many?

3   A.  I have one son, a younger son, Matthew who was killed in

4   Iraq.

5   Q.  And when was he killed?

6   A.  He was killed in January of 2009.

7   Q.  All right, sir.  So, he and Christopher were your two sons?

8   A.  That's correct.

9   Q.  All right.  Now, are you employed?

10  A.  I'm retired.

11  Q.  And what are you retired from?

12  A.  I'm retired from the United States Army.

13  Q.  How long did you spend in the Army?

14  A.  Twenty-seven years.

15  Q.  And what was your position or rank?

16  A.  I'm a retired colonel.

17  Q.  Okay.  Now, how long have you lived in Missouri?

18  A.  Approximately 29 years.

19  Q.  And when you resided in your Missouri has your family lived

20  with you?

21  A.  I'm sorry?

22  Q.  Has your family lived with you?

23  A.  Oh, yes.

24  Q.  Okay.  And I forgot to ask, how long have you been retired?

25  A.  I've been retired since 1989.

1  Q.  Okay.  You were contacted by the Pretrial Service Office, and

2  that report has been referenced already here in court, and asked

3  whether or not you would consider co-signing a bond on behalf of

4  your son, is that right?

5  A.  I was.

6  Q.  And are you willing to do that --

7  A.  I am.

8  Q.  -- if the Court requested?

9  A.  I am.

10 Q.  All right.  Sir, are you married?

11 A.  I am.

12 Q.  And you and your wife, are you willing to assist your son in

13 any way that this Court might request if bond were to be granted?

14 A.  Absolutely.

15 Q.  All right.  Let's describe a little bit for the Court first

16 your son's property.  Are you familiar with his property?

17 A.  Yes, I am.

18 Q.  Where is it located?

19 A.  It's located north of Highway 36 in DeKalb County with a

20 Cameron address.

21 Q.  Okay.  And how far is it from your living --

22 A.  Approximately eight miles.

23 Q.  All right.  And what city do you live in?

24 A.  What city?

25 Q.  Yes.

1  A.  Well, we live halfway between Cameron and Osborn --

2  Q.  Okay.

3  A.  -- in the country on a dirt road.

4  Q.  All right.

5  A.  Gravel.

6  Q.  How much property does your son have?

7  A.  I understand it's about 40 acres.

8  Q.  Okay.  Does he also have animals, livestock?

9  A.  Yes.

10  Q.  What are you aware of that he owns?

11  A.  He had a herd of goats and he has four or five donkeys.

12  Q.  Okay.  And so does he on a part-time basis engage in farming?

13  A.  Yes, he does.

14  Q.  All right.  Now, other than the farming, is your son actively

15  employed?

16  A.  No.

17  Q.  Okay.  And is that because he receives disability?

18  A.  He was medically retired from the Army.  And then returned to

19  his job as a professional firefighter in St. Joseph.

20  Subsequently, he was medically retired from the St. Joseph Fire

21  Department.

22  Q.  Okay.  So, does he receive pensions from both the Veterans

23  Administration as well as some type of either the state or city

24  of St. Joseph?

25  A.  That's correct.

1  Q.  Or the State of Missouri?

2  A.  Yes.

3  Q.  Okay.  So, he receives pensions from both of those?

4  A.  Yes.

5  Q.  All right.  And what branch of the military was your son in?

6  A.  Well, he was in MOS 37F -- Foxtrot, I think, which is

7  psychological operation.

8  Q.  Was he in the Army, Navy, Air Force?

9  A.  He was in the Army, but during his time in Iraq, he was

10  actually attached and went out on a daily basis with the Marines.

11  Q.  Okay.  And was Christopher deployed before your other son?

12  A.  The other son was deployed first, then Christopher, and then

13  Matthew again.

14  Q.  Okay.  So, he went twice.

15  A.  And Matthew was killed in his second deployment.

16  Q.  Okay.  And what did your other son do in the military?

17  A.  Well, in the first tour he was in the 82 Airborne as an

18  infantryman.  His second tour -- well, he came back.  Matthew

19  always wanted to fly, so he went to warrant officer pilot school,

20  became a warrant officer and a pilot and went back to Iraq as a

21  Kiowa pilot.

22  Q.  Okay.  And is that when he was killed?

23  A.  That is.

24  Q.  All right.  And at that time that occurred was Christopher

25  home?

1  A.  Yes.

2  Q.  All right.  He had already been returned and was living in

3  the Cameron area?

4  A.  Yes.

5  Q.  Now, does your son Christopher have children of his own?

6  A.  Yes.

7  Q.  How many?

8  A.  He has four.

9  Q.  Okay.  Does he help support those children?

10  A.  Of course, yes.

11  Q.  Okay.  Are you aware of whether any of those children reside

12  at his current home on Wamsley Road in Cameron?

13  A.  Well, at the moment, no.  But prior to all of this going on,

14  the older boys lived part-time with Christopher and part-time

15  with their mother.

16  Q.  Okay.  Are the older boys still in school?

17  A.  Yes.

18  Q.  All right.  And are you aware of whether Christopher provides

19  their insurance?

20  A.  Automobile insurance?

21  Q.  Any type of insurance.

22  A.  I'm not certain.

23  Q.  Okay.  All right.

24  A.  And on the subject of education, Christopher is within two or

25  three credits of graduating from Missouri Western.

Q.  All right.  Do you know what he's studying there?

A.  Well, he's changed his major a couple times, I'm not
absolutely sure.  But once this affair is settled, hopefully he
can go back and get his bachelor's degree.

Q.  Okay.  Now, are you aware of your son having some mental
health issues?

A.  In my opinion that's debatable.

Q.  Okay.

A.  I think --

Q.  Without opinion, are you aware of whether or not he has
mental health issues?

A.  No.

Q.  You're not aware?

A.  I'm not sure I understand the question.

Q.  Okay.  Maybe it was a bad question.  That happens sometimes.
Are you aware of whether or not your son was receiving mental
health treatment?

A.  Yes.

Q.  Okay.  What was that -- what did that treatment include to
your knowledge?

A.  To my knowledge it includes counseling, in group sessions and
individual sessions.  He has been hospitalized three times
recently for PTSD issues and so forth.  Each time released after
just a few days without any significant treatment that I can
determine ever took place.

Q.  Okay.  So, it's understanding that his treatment is in
relation to Post-Traumatic Stress Disorder?

A.  Yeah.

Q.  And was that diagnosis made as the result of his time in the
military?

A.  Well, I believe so.  But that diagnosis has been there for
quite a number of years now.

Q.  Okay.  Has your son, are you aware of him actively
participating in any programs related to post-traumatic stress,
either for himself or as a mentor for others?

A.  Yes, he does.

Q.  And what is that?

A.  Well, two things.  He has actively counseled other veterans
who were considering taking their own lives and talked them out
of it a number of times.  He also is what's called a TAPS mentor.
TAPS is an organization that stands for Tragedy Assistance,
something or another.  It's an organization that provides
assistance to anyone who has lost a family member or a close
friend in combat and -- Tragedy Assistance Program for Survivors,
a survivor being someone who lost a son, a father, a brother, or
even a close friend.

Q.  Okay.  And he's mentor in that program?

A.  He is a mentor in that program, yes, he is.

Q.  Are you aware of whether that requires him to travel
sometimes to participate in events or --

1  A.  I think it does.

2  Q.  Okay.  Prior to the incident that brings us here today, are

3  you personally aware of your son ever being involved in any

4  assaultive conduct with anyone?

5  A.  Absolutely not.

6  Q.  Now, one of the issues may be if the Court considers at some

7  point releasing Christopher, would be that if he's required to

8  take medication, that he be compliant with that.  Could you and

9  your wife assist in making sure that that occurs?

10 A.  Yes, we can.

11 Q.  All right.  One of the options the Court has at its disposal

12 is the potential of placing Christopher in an in-patient or out-

13 patient treatment.  Would you assure the Court that you would

14 assist in any way in making sure that your son would go to and

15 attend those programs?

16 A.  We will do what we can do, yes.

17 Q.  Okay.  Now, who is currently overseeing his property right

18 now?

19 A.  Well, his mother and I are trying very hard to.

20 Q.  Okay.

21 A.  His estranged wife is there also at times.  And not

22 necessarily working towards his best interest.

23 Q.  What has happened to his property within the couple of weeks

24 that he's been in custody?

25 A.  A lot of things have been removed from the property by his

1  wife who says, well, I'm taking this and that because I need to

2  sell them because I have bills and I'm short of money.  My wife

3  and I have removed some property because -- for entirely

4  different reasons, because we wanted to preserve it for him,

5  personal things.

6  Q.  Okay.

7  A.  Family heirlooms.  All sorts of things.

8  Q.  Are you aware of whether or not his home has been vandalized?

9  A.  It has.  Several days ago it was broken into.  I'm the person

10  that actually discovered it.  I had gone out there early in the

11  morning just at first light almost to break the ice on the

12  watering troughs for his livestock.  And when I got there the

13  gate was off the hinges, knocked flat on the ground.  I --

14  Q.  Had you ever noticed the gate like that before?

15  A.  No, never.

16  Q.  Okay.

17  A.  I walked up to the house and the door was standing open.

18  That had never been the case before.  And one of his vehicles, a

19  Kawasaki Mule was gone.  Now, it turns out his wife removed it.

20  And what she plans to do with it, I'm not sure.

21  Q.  Okay.  Did you observe any of his other -- his property in

22  unusual places?

23  A.  Well, inside the house it was a mess.  Oh, and there was a

24  television in the road.

25  Q.  Okay.

A.  All of the electronics in the house, TVs, computers,

associated paraphernalia was all gone.  Things were just an

absolute mess.  And one of the televisions was laying the road.

I supposed in their attempt to get away quickly it fell out of

the back of a pickup truck, I don't know.

Q.  Okay.  If Christopher were in a -- like an in-patient

program, would you and your wife do your best to preserve his

property until he could maybe get a chance to take care of it on

his own?

A.  We would do the best we could.  Yes, sir.

Q.  Okay.  All right.  There was a reference of you in the direct

testimony from the Government that potentially you may have at

some point gotten some of Christopher's guns?

A.  That is correct.

Q.  And did you get some of his guns?

A.  I did.

Q.  And did you take those guns?

A.  I did.  And the ones we took were, for the most, part family

heirlooms that was his great-great-grandfather's shotgun.  There

were a couple of guns that I had given him either for his 18th

birthday or for a Christmas present many years ago.  It's also

important to recognize that when I gained possession of those, it

had -- the motivation to do so had nothing to do with the Order

of Protection.  It was entirely because of our fear that his

estranged wife was going to get them.  She, not to preserve them,

1  but to sell them.

2  Q.  Okay.

3  A.  And we were trying to prevent that.

4  Q.  Of the guns that you took possession of, did you ever return

5  any of them?

6  A.  I did not.  The report that says that is incorrect.

7  Q.  Okay.  Did anyone from law enforcement ever talk to you about

8  it?

9  A.  Sheriff Clark asked me one time whether I could vouch that I

10  had all of his guns, that there were none on the property.  And I

11  told him in all honesty I can't say that because I don't know and

12  I didn't.

13          MR. POINDEXTER:  Okay.  Nothing further, Judge.

14          THE COURT:  Cross-examination, Ms. Dunning.

15                      CROSS-EXAMINATION

16  BY MS. DUNNING:

17  Q.  Sir, Mr. Kelley being your son, I assume you and your wife,

18  his mother, have tried to help him throughout time, correct?

19  A.  Yes.

20  Q.  Not just since all of this happened?

21  A.  Oh, no.

22  Q.  So, all of the things that you have indicated to the Court

23  you'd be willing to do to help him in this time, you have been

24  willing to do to help him previous to all of this?

25  A.  Yes.  And we've been helping manage his things as best we

1  could throughout his incarceration.

2  Q.  Okay.  And how about before his incarceration?  Were you

3  available to help him with anything that he might need at that

4  time?

5  A.  Well, sure.  Sure.

6  Q.  Okay.  How long have you lived only eight miles away from

7  your son?

8  A.  Twenty-nine years.

9  Q.  Twenty-nine years.  Okay.  And you have testified that is, of

10 course, going through a divorce, correct?

11 A.  He is.

12 Q.  And he has four children total, two older, two younger,

13 correct?

14 A.  That's correct.

15 Q.  All right.  And he does have the description of his property

16 with the resident and a barn and multiple vehicles, that's pretty

17 accurate, correct?

18 A.  I think so.

19 Q.  Okay.  And there is also a cellar there?

20 A.  Yeah.  It's a little thing external to the house.  It looks

21 like a storm cellar to me.  That's what I think it originally

22 was.  And I don't think he stores anything in it.  I'm not really

23 aware of anything.

24 Q.  Okay.  So, if there was marijuana in there, you didn't have

25 any way to know that?

A.  I didn't know anything about any marijuana anywhere on the
property.

Q.  And it sounds like when you took the guns that were the
heirlooms, do you remember the time frame of that?

A.  There were, I think, two occasions.  One, I went over there
and he brought out several which I then took away home and locked
them up.  And then another case where he brought some to me and
basically I did the same thing.  I don't have dates.

Q.  Do you believe that it was in the time frame of what we've
been talking about here today in October or November or December
of last year?

A.  I believe it was before any of the investigations began.  And
as I already said, the motivation to do so was to safeguard them
from his wife who wanted to sell them.

Q.  So, would it have been after Mrs. Kelley left the residence?

A.  I'm not sure.

Q.  Okay.  And so when you sort of picked which firearms, the
time that you went there, did you see any firearms other than the
ones that your son presented to you?

A.  Yeah.  But then more came on another day.  So, I can't say
whether -- I could not have said at the time that there were more
there or there were not more there.

Q.  It sounds like you -- so, what I'm asking you is on the day
that you went there and you went to his property, your son's
property, you said that he presented you with some firearms that

1  you then took away?

2  A.  That's right.

3  Q.  So, on that date did you see any other firearms other than

4  the ones that your son presented to you?

5  A.  At that point there were still some.  But then on another

6  occasion he brought some over to my place.  So, at that point I

7  became unsure, does he have more.  If so, how many, I don't know.

8          MS. DUNNING:  Okay.  Thank you, Your Honor.

9  BY MS. DUNNING:

10 Q.  Well, actually let me ask you this.  How many firearms total

11 did you take from you son between the two times?

12 A.  I'm going to guess that's all it is, is about a dozen.

13          MS. DUNNING:  Okay.  All right.  Thank you, Your Honor.

14          THE COURT:  Redirect examination, Mr. Poindexter?

15          MR. POINDEXTER:  No, Judge.

16          THE COURT:  All right.  Thank you, Mr. Kelley.  My

17 deepest sympathy for the loss of your son of you and your wife.

18          THE WITNESS:  Thank you.

19          THE COURT:  But thank you for your testimony.

20 Additional evidence, testimony or proffers, Mr. Poindexter?

21          MR. POINDEXTER:  No, Judge.  Just argument.

22          THE COURT:  Very well.  I will consider the evidence as

23 being fully submitted with respect to both the issue of

24 preliminary hearing and the Government's Motion for Pretrial

25 Detention.  Ms. Dunning, argument that you wish to make?

1    MS. DUNNING:  Yes, Your Honor.  Your Honor, the
2  Government is requesting the defendant's detention on both prongs
3  of the statute.  With regard to risk of flight, I am aware that
4  the defendant has a residence.  He lives near his folks.  And so
5  to some extent, the argument might be made that he's not a risk
6  of flight for one reason because everywhere he goes he makes
7  somewhat of a scene it would seem from the information we have in
8  the Affidavit and the testimony today.  So, he shows up at the
9  Clinton County Courthouse and he threatens people.  He is seen by
10  the sheriff threatening people.  He threatens the Highway Patrol
11  out in public at the Chipotle.  He's threatening his neighbors.
12  And so people have been somewhat able to keep track of him.  But
13  what I will say, Your Honor, is despite the fact that he does
14  have a residence and people seem to be able to find him because
15  of his behavior, this charge and the nature of this charge and
16  the revelation of sort of the number of folks that are sharing
17  information about him I think changes the perspective on whether
18  or not he will be a risk of flight in the future and so I would
19  make that statement to the Court.  The larger issue here clearly
20  is his danger to specific persons and the community at large.
21  The defendant, as I was going through and looking at the
22  Affidavit and considering the testimony from today, the defendant
23  in recent history has had possession of multiple firearms.  His
24  father just testified he had another dozen in addition to the
25  ones that were seized.  And while I recognize that at some point

those were legally maintained by him, presumably, certainly they were not at the time of the Order of Protection. And when asked specifically about that, the defendant lied to the sheriff when he came and maybe that could have been a resolution to all of this. But he lied about it and he retained those firearms and continued to behave in a manner that's concerning. By my count, as I was going through, the defendant has made threats of violence towards the Clinton County Sheriff, the President of the United States, his neighbor, threatening to slit her throat over a $40 debt. His son, threatening that he wanted to walk with Jesus with his son, but for the grandparents picking the son up that very day which is a circumstance which was corroborated by information from the child's parent -- mother. He made a threat towards his uncle. He made threats towards law enforcement in general multiple times to multiple people including folks that are probably in the defendant's corner, his friends, his psychiatrist, who have shared information that they believe he's a danger to law enforcement. Those aren't people, you know, that have it out for him. I think his dad was trying to make sure the Court was aware that he has, you know, some animosity between him and his wife. They're going through a divorce. But this information that was shared today in Special Agent Wray's testimony isn't just information that comes from a wife who is going through a divorce with a defendant. It was coming from his friend who spoke to him after the sheriff spoke to him. It's

coming from another friend who was on his property but
photographed a weapon there. Coming from a psychiatrist. Coming
from Sheriff Clark who appears willing at least to assist the
defendant. And so that should be kept in mind in determining the
nature of this information, sort of the far reaches of where it's
coming from to law enforcement. The defendant is a threat to
himself. He's a threat to the petitioner in the Full Order
Protection, the original petition. The neighbor with the threat
to slit her throat that has an *Ex parte* Order of Protection. He
made that general post on Facebook about the hearts and the minds
means two in the chest and one in the head. And at his arrest,
Your Honor, and the parties were made aware of the defendant's
behavior after his arrest in this case in which he had to be
hospitalized and this hearing has been set over because of that
behavior, and certain that's appropriate. And on top of that,
we've got the two neighbors that have these trespassing charges
that are Highway Patrol officers who live the defendant. So,
that makes three neighbors in his immediate area that have
complained to the police about his behavior, and either charges
or an order of protection have resulted. And so things are all
appropriate for the Court to consider with regards to the
defendant's dangerousness. I think the defense has tried to
portray that he hasn't done anything to anybody yet. I think it
would be irresponsible to say, well, it hasn't happened yet, so
we'll just presume that he doesn't mean any of it. When you're

making threats to all of these people causing concerns by all of
these people that they are in danger and that he is dangerous,
the Government believes it would be irresponsible not to detain
the defendant under these circumstances.  This is not a situation
where you've got things happening some time ago and we can't
really say what's happened in the meantime.  We have his behavior
all the way through to the time of his arrest on this charge.
And so for those reasons, the Government does believe that the
defendant should be detained.

THE COURT:  All right.  Thank you, Ms. Dunning.  Mr.
Poindexter, for Mr. Kelley.

MR. POINDEXTER:  Thank you, Judge.  First off, we think
there is limited indication that Mr. Kelley would be some type of
a flight risk here.  He's got nearly three decades in the
community in this district.  He's got close family that's here.
His children are in the area.  There's no indication that he's
ever gone off anywhere else or has been unavailable to find at
any point since he's resided here.  So, I don't believe there's
any risk of him being a flight risk.  The question, candidly, I
think what the Court would be the dangerousness issue.  And what
I think, all the information that has been provided prior to and
including what was provided today in this hearing, clearly points
to one major thing and that's mental health issues that Mr.
Kelley has had.  And I think that is something that the Court can
adequately address at this point.  Clearly, that was not part of

1   any order that was done by the state to look out for or make sure

2   that Mr. Kelley was getting appropriate mental health treatment.

3   He was doing it all kind of on his own.  And maybe he wasn't

4   doing it as well as he should have.  But when being ordered by

5   this Court to do so and having the framework in place for where

6   that can be accomplished and he can be successful at it, I think

7   is much different.  So, I think this Court can set conditions of

8   release that ensure the safety of the community here.  Of the

9   options that are available, well, clearly he's got significant

10  property that's there and his property is at jeopardy while this

11  case is going on.  The Court could impose conditions of home

12  confinement, home detention, GPS monitoring there to ensure that

13  he's not going anywhere he's not supposed to, other than his

14  mental health treatment or anything else that is approved by

15  Pretrial or the Probation Office.  This Court would also have the

16  option of considering some type of temporary, maybe in-patient

17  program.  Whether that's I believe with contract services through

18  Pathways, which has access to kind of dual diagnosis assistance,

19  substance abuse, mental health.  You know, the Government

20  referenced the issue about a week ago where Mr. Kelley was taken

21  to KU Med.  What I would say is that he was returned because he

22  is stabilized and he is on his proper medication.  I think the

23  Court can ensure that he maintains those by its order of release.

24  And so we suggest that there is a path the Court could use short

25  of his detention in this matter until this case gets resolved.

1 And we think that it would not be irresponsible at all for the

2 Court to consider conditions of release under these circumstances

3 involving Mr. Kelley.

4 　　　　THE COURT:  Thank you, Mr. Poindexter.  I will then

5 consider the evidence as being fully submitted and the issue of

6 preliminary hearing and the Government's Motion for Detention

7 ready for resolution by the Court.

8 　　　　Mr. Kelley, based on the record before me, it is my

9 judgment that there is probable cause to believe that the crimes

10 alleged in the Complaint were committed and probable cause that

11 they were committed by you.  And accordingly, I will order that

12 the matter be referred to the Grand Jury for further proceedings.

13 With respect to the Government's motion for your pretrial

14 detention, you present today with what I consider to be

15 significant and substantial family support.  I believe that you

16 do have ties to this community.  I do think on this record that

17 there are conditions of release that I could set that would

18 reasonably assure your appearance at future court proceedings.

19 As Mr. Poindexter correctly observes, the more difficult question

20 goes to whether there are conditions that will reasonably assure

21 the safety of the community.  I am persuaded that you present

22 today with what appear to me to be serious mental health

23 concerns.  That is combined with the presence of 15 firearms that

24 were discovered at your residence during the course of a search,

25 accompanied by some 20,000 rounds of ammunition and what appear

1   to be multiple allegations of threatening conduct to others.  It

2   does appear to me that prior efforts at mental health treatment

3   for you have not been overly successful, for what reasons I don't

4   know.  But I'm not persuaded at this point that the mere fact

5   that the Court would order mental health treatment would change

6   that outcome.  The bottom line, Mr. Kelley, is on this record I

7   do not believe that there are conditions of release that I could

8   set that would reasonably assure the safety of the community.

9   So, I am going to grant the Government's motion for your pretrial

10  detention.  I will follow this proceeding with an order that will

11  set forth my findings.  You are entitled to seek review of that

12  order before the District Court if you choose to do so.  But in

13  the meantime, you will be returned to the custody of the United

14  States Marshal pending further order in this case.

15          That will be the judgment and the ruling of the Court

16  this afternoon.  Ms. Dunning, anything further for the United

17  States?

18          MS. DUNNING:  No, Your Honor.

19          THE COURT:  Mr. Poindexter, for Mr. Kelley?

20          MR. POINDEXTER:  No, Your Honor.  Thank you.

21          THE COURT:  Very well.  That'll conclude this

22  proceeding.  We'll be in recess.

23              (Court Adjourned at 2:50 p.m.)

24

25

1

2                              **<u>INDEX</u>**

3

4   **<u>WITNESSES FOR</u>**
    **<u>THE PLAINTIFF:</u>**        **<u>DIRECT</u>**      **<u>CROSS</u>**        **<u>REDIRECT</u>**      **<u>RECROSS</u>**

5   Kathryn E. Wray          5              20            35              38

6   **<u>WITNESSES FOR</u>**
    **<u>THE DEFENDANT:</u>**

7
    Steven H. Kelley         41             52
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.


/s/ Lissa C. Whittaker                February 18, 2019
Signature of transcriber                    Date